**IN THE U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Jane and John Doe, individually and on behalf of all others similarly situated,** ) | **CASE NO.** |
| ) | |
| **Plaintiffs,** ) | **CLASS ACTION COMPLAINT** |
| ) | |
| **v.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNIVERSITY HOSPITALS CLEVELAND MEDICAL CENTER d/b/a as, *inter alia*, University Hospitals Rainbow Babies & Children's Hospital and University Hospitals MacDonald Women's Hospital;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNIVERSITY HOSPITALS AHUJA MEDICAL CENTER, INC.;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **COMPUTER AIDED SOLUTIONS LLC d/b/a CAS DATA LOGGERS;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **ANDREW BHATNAGER, Ph.D.;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **SODEXO OPERATIONS, LLC;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **JAMES GOLDFARB M.D.;** ) | |
| ) | |

and                                    )
                                       )
**JAMES LIU M.D.;**                    )
                                       )
and                                    )
                                       )
**BROOKE ROSSI M.D.**                  )
                                       )
            **Defendants.**            )

Plaintiffs, Jane and John Doe (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this class action complaint against University Hospitals Health System, Inc. ("University Hospitals," or "UH"), University Hospitals Cleveland Medical Center d/b/a as, *inter alia*, University Hospitals Rainbow Babies & Children's Hospital and University Hospitals MacDonald Women's Hospital ("Cleveland Medical Center"), and University Hospitals Ahuja Medical Center, Inc. ("Ahuja Medical Center") (collectively, "UH Defendants"), Computer Aided Solutions LLC d/b/a CAS Data Loggers, Andrew Bhatnager, Ph.D., Sodexo Operations, LLC, James Goldfarb M.D., James Liu M.D., and Brooke Rossi M.D. (collectively, "Defendants").  Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, and allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of the destruction of Plaintiffs' and the other Class members' eggs and embryos as a result of Defendants' conduct, which caused irreplaceable damage to their frozen eggs and embryos.

2.      Defendants had been preserving, protecting, and storing Plaintiffs' and the other Class members' eggs and embryos at a University Hospitals Fertility Center (hereinafter "Center" or "Fertility Center"), located at the Ahuja Medical Center in Beachwood, Ohio.

3.      On or about March 4, 2018, Plaintiffs' and the other Class members' frozen eggs and embryos were irreplaceably damaged while being stored at the Fertility Center.  After the eggs and embryos were irreplaceably damaged, the UH Defendants advised Plaintiffs and the other Class members that their eggs and embryo had been destroyed.

4.      The damage occurred when the temperature rose in a large storage tank in which Defendants had been preserving, protecting, and storing Plaintiffs' and the other Class members' egg and embryo specimens.  In what can only be characterized as gross negligence and an utter breach of trust, decency, and responsible stewardship, Defendants destroyed the hopes, dreams, and futures of hundreds of prospective parents and families.

5.      Recognizing the extent and consequences of its misconduct, some of the Defendants have admitted the misconduct, and that the consequence of that misconduct is that Plaintiffs' and the other Class members' frozen eggs and embryos have been destroyed or irretrievably damaged.   Indeed, when characterizing Defendants' systemic failure, Patricia DePompei, the President of University Hospitals' Rainbow Babies & Children's Hospital, reportedly said that "[i]t's absolutely devastating."

6.      Plaintiffs, individually and on behalf of the other Class members, seek damages, equitable relief, punitive damages, and other remedies from Defendants as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action, there is minimal diversity, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendants, because, as alleged below, several Defendants reside in this District, all Defendants conducted their business in this District, and the conduct giving rise to Plaintiffs and the other Class members losses occurred in this District.

9.     Venue is proper pursuant to 28 U.S.C. § 1391, because several of the Defendants have their principal places of business in this District and a substantial part of the events and omissions giving rise to this claim occurred in this District.

**PARTIES**

I.     *Plaintiffs*

10.     At all times relevant to this action, Plaintiffs, Jane and John Doe, are or were residents of Knoxville, Tennessee.  Their specific street address will be provided to this Court under seal, if required.  Plaintiffs are using pseudonyms due to the sensitive nature of their claims and the services that they purchased from Defendants.

11.     In 2011, Plaintiffs contacted the UH Defendants about the possibility of creating and storing embryos.

12.     On or about March 2012, Plaintiffs contracted with the UH Defendants to create, freeze and preserve their embryos.

13.     All Defendants had a duty to preserve Plaintiffs' embryos that were being stored in a liquid-nitrogen storage tank at the Fertility Center located at the Ahuja Medical Center.

14.     At all times relevant to Plaintiffs' claims, Defendants kept Plaintiffs' embryos under Defendants' protection, custody, and/or control.

## II.   *Defendants*

15.     Defendant University Hospitals Health System, Inc. is a tax-exempt 501(c)(3) corporation with its principal place of business in Shaker Heights, Ohio.

16.     Defendant University Hospitals Cleveland Medical Center is a tax-exempt 501(c)(3) corporation with its principal place of business in Shaker Heights, Ohio.  The Cleveland Medical Center does business as, *inter alia*, University Hospitals Rainbow Babies & Children's Hospital and University Hospitals MacDonald Women's Hospital.

17.     At all times relevant to this action, University Hospitals and/or University Hospitals Cleveland Medical Center operated the Ahuja Medical Center, which was opened in 2011.

18.     Defendant University Hospitals Ahuja Medical Center, Inc. is one of University Hospitals' eleven community medical centers.  It is located at 3999 Richmond Road, Beachwood, Ohio.  The Ahuja Medical Center offers specialized medical and surgical services, including in-vitro fertilization ("IVF").  Among its service offerings, the Ahuja Medical Center offers services through the Fertility Center.

19.     Defendant Computer Aided Solutions LLC d/b/a CAS Data Loggers ("CAS") is a limited liability company with its principal place of business in Chesterland, Ohio.  CAS implements and/or maintains temperature monitoring systems and/or alarms, including the temperature monitoring system and/or alarm used by the UH Defendants to ensure the safe, long-term storage of Plaintiffs' and the other Class members' eggs and embryos.

20.     Defendant Andrew Bhatnager Ph.D., at all times relevant to this action, was the off-site lab director for the UH Defendants' Fertility Clinic and was acting within the course, scope and in furtherance of his employment and/or agency, for the UH Defendants.  His duties as lab director included, but were not limited to, insuring the safe operation and management of lab

equipment, including two biogenic freezer tanks, storing embryos, eggs, and other biological materials, alarms for such storage, and decision-making with regard to lab staffing, lab training, lab operation and service, repair and operation of such lab equipment, and alarm reporting and monitoring.

21.     Defendant Sodexo Operations, LLC ("Sodexo") is a corporation organized under the laws of the State of Delaware.  At all times relevant to this action, Defendant Sodexo contracted with the UH Defendants in the County of Cuyahoga, State of Ohio for provision of consultation, facility management, operations, system, workers, advisors, and/or services related to and/or that affected the safe operation of the Fertility Center, including but not limited to, staffing and/or the proper supply of nitrogen for the storage tanks.

22.     Defendant James Goldfarb M.D., the Administrative Director of the UH Defendants' Fertility Center, a doctor and salesperson, who, at all times relevant to this action was acting within the course and scope of his employment for the UH Defendants.  It was his responsibility, among other of his duties, to oversee and ensure proper staffing, equipment selection, purchasing, servicing, and operation of the UH Defendants' Fertility Center, from on or about 2011 through March 4, 2018.  He would also sell IVF fertility and cryopreservation packages to prospective patients, such as Plaintiffs and the other Class members, after medically determining that they were candidates for these services.

23.     Defendant James Liu M.D., a doctor, salesperson, and supervisor of the UH Defendants' Fertility Center, was at all times relevant to this action, acting within the course and scope of his employment for the UH Defendants.  It was his responsibility, among other of his duties, to sell IVF fertility and cryopreservation packages to prospective patients, such as Plaintiffs

and the other Class members, after medically determining that they were candidates for these services.

24.     Defendant Brooke Rossi M.D., a doctor, salesperson, and supervisor of the UH Defendants' Fertility Center, who, at all times relevant to this action, was acting within the course and scope of her employment for the UH Defendants.  It was her responsibility, among other duties, to sell IVF fertility and cryopreservation packages to prospective patients, such as Plaintiffs and the other Class members.

## FACTUAL ALLEGATIONS

**The IVF and Cryopreservation Process**

25.     IVF is an invasive and technical process, involving multiple surgical procedures, laboratory fertilization and manipulation, and an intense drug regimen.

26.     The first step in the IVF process involves several weeks of drug therapy designed to hyper-stimulate the woman's reproductive system into producing multiple eggs as part of her monthly cycle.  These eggs are surgically harvested and then fertilized with sperm in a laboratory. Once the eggs have been fertilized into embryos, they are cultured for two to six days in a growth medium.  At that point, the embryos are either cryo-preserved (vitrified) for later use, or, if a fresh transfer is desired, they are then transferred directly into the woman's uterus.

27.     During the process of cryopreservation, fertilized eggs (pre-embryos) or unfertilized eggs are preserved for future use.  The eggs and embryos are first treated with a solution to protect them from damage during freezing.  They are then gradually cooled to a temperature of -60 to -80 degrees Celsius (-76 to -112 Fahrenheit) and placed in liquid nitrogen for long-term storage.  Once thawed, the undamaged, eggs or embryos can be transferred into the uterus.

28.     The total cost of IVF and cryopreservation, including the medications involved, the storage fees, and the implantation procedure, can cost in excess of $20,000.

**The University Hospitals Fertility Center**

29.     The Fertility Center, through its employees and agents, which includes Defendants Bhatnager, Goldfarb, Lui, and Rossi, offers, among other services, an IVF program, with IVF and andrology laboratories.

30.     University Hospitals claims and represents that its Fertility Center's laboratories "feature[s] the most advanced technology available."  Some of the treatment options University Hospitals offers at its Fertility Center are embryo cryopreservation, "[w]here excess embryos from a single procedure are frozen for implantation at a later date" and egg freezing, which "[a]llows a woman to electively freeze her eggs at a younger age for use at a later date."

31.     The use of appropriate technologies and maintenance protocols is necessary to ensure the safekeeping of cryopreserved eggs and embryos.  Safe long-term storage requires appropriate storage tanks and systems, backup redundancies to guard against catastrophic failure of storage tanks and systems, regular inspections of storage tanks and systems, and automated temperature and fill-level gauges linked to alarm systems to notify staff immediately of a potential failure of storage tanks and systems.

32.     Egg and embryo cryopreservation involves preservation of human eggs and embryos using cooling techniques.

33.     Plaintiffs and the other Class members are clients of the Fertility Center who stored their eggs and embryos in the Center's cryopreservation embryology storage tank.

34.     Plaintiffs and the other Class members trusted Defendants to freeze and safely store their eggs and embryos for future use and preserve their ability to have children.

35.     A frozen egg allows a woman to preserve fertility.  Similarly, a frozen embryo allows a couple to preserve fertility for a future use.

36.     Plaintiffs' and the other Class members' frozen eggs and embryos were stored at the Fertility Center in a storage tank that was monitored by the UH Defendants and their employees and agents, including Defendants Bhatnager, Goldfarb, Lui, and Rossi, facility services provided by Defendant Sodexo, and Defendant CAS, which provided the remote alarms for the Fertility Center system.

37.     At all times relevant to this action, Plaintiffs' and the other Class members' eggs and embryos were under Defendants' protection, custody, and/or control while stored at the Fertility Center inside of the Ahuja Medical Building in Beachwood, Ohio.

**Plaintiffs' and the Other Class Members' Frozen Eggs and Embryos Were Destroyed**

38.     The March 4, 2018 tragedy could have been—and should have been—prevented. For an extended period of time, the UH Defendants, including Defendants Bhatnager, Goldfarb, Lui, and Rossi, knew or should have known that the storage tank containing Plaintiffs' and the other Class members' eggs and embryos required preventative maintenance, because the embryology storage tank was not functioning properly.  Although the tank was designed to fill liquid nitrogen automatically into a reservoir on the outside of the tank, that feature was not working properly.

39.     The UH Defendants, however, did not transfer the eggs and embryos to another storage tank; nor did the UH Defendants or Defendants Bhatnager, Goldfarb, Lui, or Rossi, advise Plaintiffs or the other Class members that their eggs and embryos were being stored in a defective tank.

40.     Rather than transferring the eggs and embryos to another tank, for an extended period of time, the UH Defendants, through their employees and agents, were manually filling the storage tank by connecting a line to the embryology storage tank with liquid nitrogen kept in the Fertility Center lab.

41.     The UH Defendants, however, ran out of liquid nitrogen that could be used to fill the tank's chamber by connecting a line with the tank.  For an extended period of time, including March 2, 2018, the UH Defendants took liquid nitrogen tanks from the andrology lab, because Defendant Sodexo failed to timely deliver liquid nitrogen to the embryology lab, and the UH Defendants, through their employees and agents, poured the liquid nitrogen into the top of the storage tank, rather than filling the tank's designated reservoir for liquid nitrogen.  This technique materially deviates from the tank manufacturer's guidelines.

42.     The UH Defendants reported that they checked the liquid nitrogen levels in the tank on March 2, 2018 and March 3, 2018.  The UH Defendants admit, in their March 26, 2018 letter sent to all Class members, however, that they suspected that the liquid nitrogen levels in the tank were too low—and that those temperatures were insufficient to maintain the necessary temperature to protect the thousands of eggs and embryos in the tank.

43.     Starting on the afternoon of March 3, 2018, and continuing through the early morning of March 4, 2018, the storage tank holding Plaintiffs' and the other Class members' eggs and embryos experienced a temperature fluctuation.  Although the storage tank sounded an alarm, no one was at the Fertility Center to hear it.

44.     The UH Defendant also had an off-site monitoring program for the storage tank provided by Defendant CAS.  Nonetheless, on March 3, 2018—and for a period of time before

that date—that alarm system was turned off.  Accordingly, the storage tank's temperature was left unmonitored from the afternoon of March 3, 2018, until the morning of March 4, 2018.

45.     When the UH Defendants' employees returned to the Fertility Center on the morning of March 4, 2018, they heard the alarm on the tank and discovered that thousands of Plaintiffs' and the other Class members' frozen eggs and embryos had been subjected to unsafe temperatures.

46.     Thereafter, the UH Defendants acknowledged—in writing and through video posts on Facebook and through local news outlets, that the eggs and embryos stored at their Fertility Center were subjected to an "unexpected temperature fluctuation."[1]   The UH Defendants represented that they were "assessing the circumstances surrounding the catastrophic failure at our fertility clinic and why this happened"[2]

47.     On March 8, 2018, Cleveland-area media outlets reported that a storage tank at the Fertility Center had experienced a temperature fluctuation that damaged eggs and embryos.  At that time, the UH Defendants represented that approximately 700 families and 2,000 eggs and embryos were affected and that those families had received letters informing them of Defendants' systemic failure and the resultant damages to affected parties, including Plaintiffs and other Class members.

48.     The UH Defendants commenced an investigation to determine why the temperature rose in the tank, destroying or otherwise irreversibly damaging Plaintiffs' and the other Class members' eggs and embryos.  Patricia DePompei, President of University Hospitals' Rainbow Babies & Children's Hospital, said that hospital staff members have consulted with experts to

---

[1] https://www.facebook.com/watch/?v=1619802421389723 (last accessed March 2, 2020).

[2] March 26, 2018 letter the UH Defendants sent to Class members

"better understand the cause of this temperature fluctuation and ensure that it doesn't happen again."  DePompei admitted to NBC News that, "we do know that the temperature that was measured at a portion of the tank was higher than our acceptable limits."

49.    The UH Defendants reported the incident to the federal regulators that monitor fertility clinics through Clinical Laboratory Improvement Amendments ("CLIA").  The U.S. Food and Drug Administration, Center for Medicaid Services, and Centers for Disease Control and Prevention, are responsible for CLIA, which regulates lab quality and requires state certification.

50.    In a video posted on Facebook, Patricia DePompei, on behalf of the UH Defendants, said, "We are so very sorry this happened, and we want to do all that we can to support our patients and families through this very difficult time."  DePompei is also reported to have characterized the tragedy as being "absolutely devastating."

51.    On or about March 26, 2018, the UH Defendants sent another letter to Plaintiffs and the other Class members.  Through this letter, the UH Defendants made further admissions about the scope of the Fertility Center tragedy and provided additional details relating thereto.  First, the UH Defendants revealed that *more* eggs and embryos were affected than they first estimated.  Instead of the approximately 700 families and/or individuals and 2,000 eggs and embryos initially thought to be affected, the UH Defendants admitted that approximately 950 families and/or individuals and more than 4,000 eggs and embryos were affected.  Second, the UH Defendants also admitted that it is unlikely that any of the eggs and embryos remained viable.  Third, the UH Defendants made further admissions about what happened at the Fertility Center lab, including:  (a) that the tank needed preventative maintenance; (b) that the UH Defendants were improperly filling the tank from the top; (c) that the embryology IVF lab ran out of liquid nitrogen;

and (d) that the remote alarm on the affected tank, which was designed to alert the UH Defendants to temperature swings, was turned off and had been off for an extended period of time.

52.     The UH Defendants also admitted that they are responsible for the failures at the Fertility Center and are sorry for causing "such a devastating loss."

53.     The remote alarm system referred to in the March 26, 2018 letter, was designed, implemented, and/or maintained by Defendant CAS.  Defendant CAS had a duty to ensure that the UH Defendants were warned and/or notified when temperatures in the liquid nitrogen storage tanks rose above an appropriate level.  Defendant CAS failed to provide timely warning and/or notification of the rise in temperature in the tank in which Plaintiffs' and the other Class members' eggs and embryos had been stored.

54.     On March 27, 2018, University Hospitals' CEO, Tom Zenty, stated, "we know we made mistakes" and that this is a "terrible situation."

55.     Mr. Zenty explained that the UH Defendants knew that Plaintiffs and the other Class members entrusted them to store their eggs and embryos and were "woman and men who counted on us those who asked us to help them with their families"

56.     He went on to state, "we can't give back what was lost," and "we failed our fertility clinic patients."

57.     Plaintiffs and the other Class members are now older than they were when they began the IVF process or egg freezing process.  Testimonials from doctors on the Fertility Center's website and medical literature indicates that Plaintiffs' and the other Class members' chances for producing viable and strong eggs have decreased over the intervening time.  Moreover, the costs—both financial and emotional—of undergoing another painful and drawn-out IVF procedure,

during which there is no guarantee that Plaintiffs and/or the other Class members will be able to produce strong and viable eggs for fertilization and transfer, are daunting.

58.    Plaintiffs and the other Class members have been damaged and injured by, among other things:  (a) the destruction of their stored eggs and embryos, which were extremely precious and unique property; (b) reduced chances for producing strong and viable eggs and embryos; (c) the loss of their ability or chance of conception by using the stored eggs and embryos; (d) the loss of their time and efforts committed to creating the frozen eggs and embryos; and (e) having to undergo the risk, pain, and expense of surgical procedures that were subsequently rendered futile and unnecessary by Defendants' actions and failures.

59.    Defendants' failures rise to the level of malice defined by recklessness, willful and wanton misconduct, and/or a conscious disregard for the rights and safety of Plaintiffs and the other Class members in a circumstance that had a great probability of causing substantial harm and, in fact, did cause substantial harm to Plaintiffs and the other Class members.

60.    Defendants' misconduct, as alleged herein, constitutes misconduct that exposes Defendants to punitive damages.

## CLASS ACTION ALLEGATIONS

61.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of all others similarly situated, seek certification of a class (the "Class") defined as:

> All University Hospitals patients and/or other family members affected by the loss of or damage to their eggs and/or embryos that occurred on or about March 3-4, 2018 at the UH Fertility Clinic, located at the Ahuja Medical Center, who have not filed individual lawsuits against Defendants.

62.    Excluded from the Class are Defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, agents, successors, or assigns; and any judicial officer who

considers or renders a decision or ruling in this case, their staff, and their immediate family members.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

63.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

64.     **Numerosity:  Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe—based upon University Hospitals' press statements and other publicly available information—that there are more than 950 Class members.  Those individuals' names and addresses are available from the UH Defendants' records, and Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

65.     **Commonality and Predominance:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact that are susceptible to common answers, which predominate over any questions affecting individual Class members, including, without limitation:

       a.      Whether the March 3-4, 2018 temperature fluctuation in the storage tank at the Ahuja Medical Center was the result of Defendants' negligence or other wrongful conduct;

       b.      Whether Defendants failed to take adequate and reasonable measures to ensure their Fertility Center systems were protected;

       c.      Whether Defendants failed to take available steps to prevent and stop the storage tank failure from happening;

15

d.      Whether Defendants knew or should have known that their Fertility Center systems and/or processes were vulnerable to failure;

e.      Whether Defendants failed to disclose the material facts that they did not have adequate procedures and security practices to safeguard Plaintiffs' and the other Class members' eggs and embryos entrusted to Defendants' care;

f.      Whether Defendants failed to provide timely and adequate notice of the systems failures leading to the destruction of Plaintiffs' and the other Class members' eggs and embryos;

g.      Whether Defendants owed a duty to Plaintiffs and the other Class members to protect the eggs and embryos that were entrusted to Defendants' care;

h.      Whether Defendants breached their duties to protect the eggs and embryos that Plaintiffs and the other Class members entrusted to their care;

i.      Whether Defendants breached their contracts, whether express, implied, or via third-party beneficiary status, with Plaintiffs and the other Class members affected by the March 3-4, 2018 temperature fluctuation in the storage tank at the Ahuja Medical Center;

j.      Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the failure of Defendants' systems, resulting in the destruction of the eggs and embryos that Plaintiffs and the other Class members entrusted to Defendants' care;

k.      Whether Defendants' conduct renders them liable for the specific claims for relief listed below;

l.      Whether, as a result of Defendants' conduct, Plaintiffs and the other Class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled; and

m.      Whether, as a result of Defendants' conduct, Plaintiffs and the other Class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

66.      **Typicality:  Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims, because Defendants subjected Plaintiffs and the other Class members to the same allegedly unlawful conduct and damaged them in the same way.

67.      **Adequacy of Representation:   Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives, because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to vigorously prosecute this action.  The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

68.      **Declaratory and Injunctive Relief:  Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  Such individual actions would create a risk of adjudications, which would be dispositive of the interests of the other Class members and impair their interests.  Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

69.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (against the UH Defendants and Defendant Bhatnager)

70.     Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

71.     The UH Defendants and Defendant Bhatnager, owed to Plaintiffs and the other Class members a duty to exercise the highest degree of care with respect to maintaining, inspecting, monitoring, and/or testing the liquid nitrogen storage tanks used for preserving eggs and embryos at University Hospitals' Fertility Center that is located at the Ahuja Medical Center.

72.     The UH Defendants and Defendant Bhatnager,  breached those duties and/or were negligent in one or more of the following acts or omissions:

a. failing to maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks;

b. permitting the temperature to rise in one of their liquid nitrogen storage tanks, "higher than [Defendants'] acceptable limits";

c. failing to recognize and adequately respond to an alarm that signified a temperature flux in the storage tank;

d. failing to properly safeguard the eggs and embryos;

e. failing to have a backup tank available for immediate transfer of the eggs and embryos;

f. failing to maintain sufficient liquid nitrogen in the Fertility Center lab that could fill the tank as recommended by the tank manufacturer;

g. failing to follow known scientific and laboratory procedures; and/or

h. were otherwise careless and/or negligent and/or grossly negligent.

73.     The UH Defendants and Defendant Bhatnager, were also grossly negligent for failing to exercise reasonable care through one or more of the above-listed acts or omissions. Those Defendants acted willfully and/or wantonly with a conscious or reckless disregard for the rights of Plaintiffs and the other Class members that had a great probability of causing—and did cause—substantial harm.

74.     As a proximate result of one or more of Defendants' negligent and/or grossly negligent acts and/or omissions, Plaintiffs and the other Class members suffered, and continue to suffer, injuries of a personal and pecuniary nature in an amount to be determined at trial.

**COUNT II**
**BREACH OF CONTRACT**
**(against the UH Defendants)**

75.     Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

76.     The UH Defendants entered into contracts with Plaintiffs and each of the other Class members, wherein the UH Defendants agreed to collect, store, preserve, and deliver, at a later date, Plaintiffs' and the other Class members' eggs and/or embryos to them.

77.     In pertinent part, each of those contracts contained the following provision:

If embryos are frozen the embryos will be stored in the in vitro fertilization laboratory in the frozen condition until such time as the physician responsible for your care determines appropriate conditions exist in the Recipient's body for transfer of the embryo to the Recipient's uterus and the Recipient desires placement of the embryos in her uterus.  At that time, some or all of the embryos will be thawed.

78.     The UH Defendants also stated in the contract that "Embryos may be frozen indefinitely" through embryo freezing, and that "back up freezer systems and/or liquid nitrogen holding facilities are available to decrease the likelihood of any malfunction."

79.     In consideration of the UH Defendants' promises, Plaintiffs and the other Class members agreed to pay, and paid, fees for the services rendered.

80.     Plaintiffs and the other Class members performed all of the terms and conditions required of them under their contracts.

81.     Based on the conduct described herein, the UH Defendants breached the contracts with Plaintiffs and each of the other Class members.

82.     By reason of the UH Defendants' breach, Plaintiffs and each of the other Class members experienced irreplaceable damage to their eggs and embryos that they entrusted to the UH Defendants, in amounts to be determined at trial.

## COUNT III
## BAILMENT
### (against the UH Defendants)

83.     Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

20

84.     Plaintiffs and the other Class members delivered to the UH Defendants, for safekeeping, personal property to be safely and securely kept and to be redelivered to them on demand.

85.     The UH Defendants received eggs and embryos from Plaintiffs and the other Class members on this condition.

86.     Plaintiffs and the other Class members agreed to pay, and paid, fees in exchange for the UH Defendants' promise to keep their eggs and embryos safe.

87.     The UH Defendants had a duty to exercise ordinary care in the safekeeping of Plaintiffs' and the other Class members' eggs and embryos delivered to them, and the UH Defendants had a duty to return the eggs and embryos, undamaged, to Plaintiffs and the other Class members.

88.     The UH Defendants invited the general public, including Plaintiffs and the other Class members in particular, to entrust eggs and embryos to their care by holding themselves out to be a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a satisfactory manner.

89.     Because of the UH Defendants' wrongful conduct, as set forth herein, Plaintiffs' and other Class members' property was irreplaceably damaged, which precludes redelivery of the property or any party of the property to Plaintiffs and the other Class members.

90.     The UH Defendants breached their duty to exercise ordinary care in the safekeeping of Plaintiffs' and the other Class members' eggs and embryos delivered to the UH Defendants and to return the eggs and embryos, undamaged, to Plaintiffs and the other Class members.

91.     As a result of the UHs Defendants' wrongful conduct, as set forth herein, Plaintiffs and the other Class members have been deprived of the opportunity to use their eggs and embryos.

They have suffered and continue to suffer damages in an amount to be determined at trial.

## COUNT IV
### OHIO CONSUMER SALES PRACTICES ACT,
### OHIO REV. CODE §§ 1345.01, *et seq.*
### (against the UH Defendants)

92.     Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

93.     At all times relevant to this action, Plaintiffs and Class members were "consumers," as defined by Ohio Rev. Code § 1345.01.

94.     At all times relevant to this action, the UH Defendants were a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

95.     The UH Defendants advertised, offered, and sold their cryopreservation and storage services to Plaintiffs and the other Class members.

96.     The UH Defendants engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code §§ 1345.02, including: representing that its goods, services, and intangibles had performance characteristics, uses, and benefits that it did not have, in violation of Ohio Rev. Code § 1345.02(B)(1); and representing that its goods, services, and intangibles were of a particular standard or quality when they were not, in violation of Ohio Rev. Code § 1345(B)(2).

97.     The UH Defendants engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code Ann. § 1345.03, including:  (a) knowingly taking advantage of the inability of Plaintiffs and the other Class members to reasonably protect their interest because of their ignorance of the issues discussed herein (Ohio Rev. Code Ann. § 1345.03(B)(1)); (b) inducing Plaintiffs and the other Class members to enter into an agreement that the UH Defendants knew Plaintiffs and the other Class members would not

22

be able to receive a substantial benefit from the subject of the consumer transaction (Ohio Rev. Code Ann. § 1345.03(B)(3)); and (c) knowingly making misleading statements of opinion on which Plaintiffs and the other Class members relied on to their detriment, namely, that the UH Defendants' laboratory and cryopreservation services were state-of-the-art and that "back up freezer systems and/or liquid nitrogen holding facilities are available to decrease the likelihood of any malfunction." (Ohio Rev. Code Ann. § 1345.03(B)(6)).

98.    Moreover, the UH Defendants have committed unfair, deceptive, and unconscionable acts by knowingly concealing and/or omitting the systemic shortcomings and failures at the Fertility Center, that the UH Defendants' laboratory and cryopreservation services were not state-of-the-art, and/or that back up freezer systems and/or liquid nitrogen holding facilities were not available to decrease the likelihood of any malfunction.

99.    The Ohio Attorney General made available for public inspection prior state court decisions that have held that the UH Defendants' acts and omissions, as detailed in this Complaint, including, but not limited to, the making and distribution of false, deceptive, and/or misleading representations and omissions, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act. These cases include, but are not limited to, the following:

a. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); and

b. *Nick Lardakis v. Joanne Martin, K.E.L., Inc., et al.* No. CV 94010234, (OPIF #10001436).

100.    The UH Defendants' representations and omissions about the quality of their laboratory and systems to prevent malfunctions were material, because they were likely to deceive reasonable consumers.

101.    UH Defendants intended to mislead Plaintiffs and the other Class members and induce them to rely on the UH Defendants' misrepresentations and omissions about the quality of

their laboratory and systems to prevent malfunctions so that the UH Defendants could receive payment from Plaintiffs and the other Class members for the UH Defendants' IVF and cryopreservation services and attendant yearly storage fees.

102. UH Defendants acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiffs' and other Class members' rights. The UH Defendants' knowledge about the shortcomings and failures of their Fertility Center systems, equipment, and safeguards put the UH Defendants on notice that their cryopreservation services were not as advertised.

103. UH Defendants' unfair, deceptive, and unconscionable acts and practices complained of herein affected Plaintiffs and the other Class members who agreed to pay yearly storage fees to the UH Defendants to store their eggs and embryos for future use.

104. As a direct and proximate result of the UH Defendants' deceptive acts and practices, Plaintiffs and the other Class members have suffered ascertainable losses of money and property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in paying for the storage fees charged by the UH Defendants to safely store eggs and embryos.

105. Plaintiffs and the other Class members seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

## COUNT V
## NEGLIGENCE
### (against Defendant CAS)

106. Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

107. Defendant CAS voluntarily undertook the affirmative duty to remotely monitor the temperature of the UH Defendants' liquid nitrogen storage tank holding Plaintiffs' and the other Class members' eggs and embryos at the Fertility Center, and, therefore, had a duty to perform these services with a reasonable degree of care.

108. Defendant CAS also knew or should have known that its services were necessary to protect Plaintiffs' and the other Class members' eggs and embryos and that its failure to exercise a reasonable degree of care would increase the risk of harm to Plaintiffs' and the other Class members' eggs and embryos stored within the tank.

109. Defendant CAS owed Plaintiffs and the other Class members a duty to ensure that the temperature monitoring system and/or alarm on the liquid nitrogen storage tank holding Plaintiffs' and the other Class members' eggs and embryos were functioning correctly at all times. Defendant CAS had a duty to warn the UH Defendants when the temperature in the storage tank rose above a certain level. Defendant CAS's failure to exercise reasonable care in rendering these services resulted in an increased risk of harm to Plaintiffs' and the other Class members' eggs and embryos stored within the tank.

110. In their contract with Plaintiffs and the other Class members, the UH Defendants stated that the Fertility Center had backup systems to protect the eggs and embryos from destruction caused by mechanical failures. The services provided by Defendant CAS to remotely monitor the temperature in the storage tank were part of the backup systems promised to Plaintiffs and the other Class members. Defendant CAS thus voluntarily undertook part of the duty owed by the UH Defendants to Plaintiffs and Class members to provide a backup system to protect Plaintiffs' and the other Class members' eggs and embryos stored within the tank.

111.    Defendant CAS knew and/or should have recognized that a failure to alert the UH Defendants of a rise in temperature in the storage tank at the Fertility Center would increase the risk of harm to Plaintiffs' and the other Class members' eggs and embryos that were stored within the tank.

112.    Defendant CAS breached those duties and/or was negligent in one or more of the following acts or omissions:

      a.  Creating and/or implementing and/or maintaining a defective temperature monitoring system and/or alarm;

      b.  Negligently, recklessly, and/or intentionally deactivating the temperature monitoring system and/or alarm despite having knowledge that such actions would result in irretrievable damage and/or destruction of Plaintiffs' and the other Class members' eggs and embryos;

      c.  Failing to warn and/or notify the UH Defendants that the temperature monitoring system and/or alarm was not functioning and/or that the temperature in the liquid nitrogen storage tanks was rising to levels that would cause harm to Plaintiffs' and the other Class members' eggs and embryos; and/or

      d.  were otherwise careless and/or negligent and/or grossly negligent.

113.    Defendant CAS was also grossly negligent and/or reckless for failing to exercise care through one or more of the above-listed acts or omissions.  Defendant CAS acted willfully and/or wantonly with a conscious or reckless disregard for the rights of Plaintiffs and the other Class members that had a great probability of causing—and did cause—substantial harm.

114.    As a proximate result of one or more of the Defendant CAS's negligent and/or grossly negligent acts and/or omissions, Plaintiffs' and the other Class members' eggs and embryos suffered harm and were destroyed.  Plaintiffs and the other Class members suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## COUNT VI
## NEGLIGENCE
### (against Defendant Sodexo)

115.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

116.    At all times relevant to this action, Defendant Sodexo had a duty to timely deliver liquid nitrogen, facility services, and goods needed for the proper operation of the Fertility Center.

117.    Defendant Sodexo undertook this duty to Plaintiffs and the other Class members when it contracted with the UH Defendants to provide facility services to the Fertility Center, including but not limited to, timely delivering and connecting liquid nitrogen tanks to the necessary equipment in the Fertility Center.

118.    On March 2, 2018, an emergency order was placed with Defendant Sodexo to bring liquid nitrogen to the embryology lab at the Fertility Center.

119.    Despite this emergency order, Defendant Sodexo failed to timely supply the embryology lab at the Fertility Center with liquid nitrogen prior to the March 3-4, 2018 tragedy.

120.    The nitrogen ordered on March 2, 2018 was not delivered to the embryology lab at the Fertility Center until after the March 3-4, 2018 tragedy.

121.    Defendant Sodexo breached its duty when it did not timely deliver the liquid nitrogen to the embryology lab at the Fertility Center on March 2, 2018.

122.    Defendant Sodexo was negligent and/or grossly negligent and/or reckless when it did not timely deliver to the Fertility Center the requested liquid nitrogen.  Defendant Sodexo acted willfully and/or wantonly with a conscious or reckless disregard for the rights of Plaintiffs and the other Class members that had a great probability of causing—and did cause—substantial harm.

123. As a proximate result of one or more of the Defendant Sodexo's negligent and/or grossly negligent acts and/or omissions, Plaintiffs' and the other Class members' eggs and embryos suffered harm and were destroyed. Plaintiffs and the other Class members suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**
**(against the UH Defendants)**

124. Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

125. The UH Defendants represented to Plaintiffs and other Class members that the Center's IVF laboratory featured advanced technology. The Defendants told Plaintiffs that the Center had appropriate safeguards in place to protect against an equipment failure, including that back-up freezer systems and/or liquid nitrogen holding facilities are available to decrease the likelihood that equipment failures could harm Plaintiffs' and the other Class members' frozen eggs and embryos that would be stored at the Fertility Center.

126. The representations were made by the UH Defendants in the contract for cryopreservation services with Plaintiffs and the other Class members, which stated, in pertinent part, "Embryos may be frozen indefinitely" through embryo freezing, and that "back up freezer systems and/or liquid nitrogen holding facilities are available to decrease the likelihood of any malfunction."

127. Additional statements were made by the UH Defendants on their websites and marketing materials about the advanced technology and services that the UH Defendants were claiming to provide to Plaintiffs and the other Class members.

128.    Plaintiffs and the other Class members relied on the representations from the UH Defendants when Plaintiffs and the Class members made the decision to store their frozen eggs and embryos at the Fertility Center.

129.    The representations from the UH Defendants were false.  The Fertility Center did not have appropriate safeguards in place to protect Plaintiffs' and the other Class members' eggs and embryos from failures at the Fertility Center on March 3-4, 2018.

130.    The UH Defendants' failure to move Plaintiffs' and the other Class members' eggs and embryos from the defective tank, despite having notice for some time that the storage tank was not functioning properly, contradicts the UH Defendants' previous representations to Plaintiffs and the other Class members that the Fertility Center's IVF laboratory featured advanced technology and that the Center had back-up freezer systems and/or liquid nitrogen holding facilities available to decrease the likelihood of equipment failure.

131.    As a result, the UH Defendants failed to exercise reasonable care or competence in communicating the false information discussed above, namely, that they had back-up freezer systems and/or liquid nitrogen holding facilities available in case there was an equipment malfunction.

132.    As a proximate result of one or more of the negligent misrepresentations from the UH Defendants, Plaintiffs and the other Class members suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## COUNT VIII
## NEGLIGENT HIRING, TRAINING, RETENTION, STAFFING, SUPERVISION
### (against the UH Defendants)

133.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

29

134.   At all times relevant to this action, the UH Defendants negligently hired, trained and/or retained, staffed and/or supervised their employees and/or agents involved with the Fertility Center cryopreservation services.  This includes, but is not limited to the UH Defendants' agents and/or employees who failed to properly operate and/or the turned off the Fertility Center remote monitoring/alarm system, failed to check and/or timely fill the problematic freezer tank with liquid nitrogen, failed to open (as required) the lid on the embryology tank to make a daily visual inspection, and/or failed to timely and properly refill the liquid nitrogen according to the tank manufacturer's guidelines.

135.   As a direct and proximate result of the UH Defendants' negligent hiring, training, retaining, staffing, and supervising of their employees and/or agents, Plaintiffs and the other Class members incurred foreseeable severe property and economic damage in an amount to be determined at trial.

**COUNT IX**
**NEGLIGENT HIRING, TRAINING,**
**RETENTION, STAFFING, SUPERVISION**
**(against Defendant Sodexo)**

136.   Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

137.   Defendant Sodexo negligently hired, trained and/or retained, staffed and/or supervise their employees and/or agents involved with the Fertility Center cryopreservation services.  This includes but is not limited to its agents and/or employees who failed to timely respond to an emergency request for the delivery and hookup of liquid nitrogen to the Fertility Center.

138.   As a direct and proximate result of Defendant Sodexo's negligent hiring, training, retaining, staffing, and supervising of their employees and/or agents, Plaintiffs and the other Class

30

members incurred foreseeable severe property and economic damage in an amount to be determined at trial.

## COUNT X
### THIRD-PARTY BENEFICIARY OF CONTRACTS
**(against Defendant Sodexo)**

139.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

140.    Defendant Sodexo entered into legal contracts with the UH Defendants to provide services essential for the ongoing viability, safety, and security of Plaintiffs' and the other Class members' eggs and embryos.  Those contracts cannot be attached to this pleading because they are within the possession of Defendants and are protected by confidentiality and/or a protected trade secret that the UH Defendants have sought to keep protected.

141.    Plaintiffs and the other Class members were intended third-party beneficiaries of such contracts.

142.    Defendants breached such contracts through the negligent, careless, reckless, and/or wrongful conduct described herein.

143.    Such breaches, namely, not providing the agreed upon services required to safely store Plaintiffs' and the other Class members' eggs and embryos, were a direct and proximate cause of damages suffered by Plaintiffs and the other Class members in an amount to be determined at trial.

## COUNT XI
### THIRD-PARTY BENEFICIARY OF CONTRACTS
**(against Defendant CAS)**

144.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

145.    Defendant CAS entered into legal contracts with the UH Defendants to provide services essential for the ongoing viability, safety, and security of Plaintiffs' and the other Class members' eggs and embryos.  Such contracts cannot be attached to this pleading because they are within the possession of Defendants and are protected by confidentiality and/or a protected trade secret that the UH Defendants have sought to keep protected.

146.    Plaintiffs and the other Class members were intended third-party beneficiaries of such contracts.

147.    Defendants breached such contracts through the negligent, careless, reckless, and/or wrongful conduct described herein.

148.    Such breaches, namely, not providing the agreed upon services required to safely store Plaintiffs' and the other Class members' eggs and embryos, were a direct and proximate cause of damages suffered by Plaintiffs and the other Class members in an amount to be determined at trial.

**COUNT XII**
**PUNITIVE DAMAGES**
**(against all Defendants)**

149.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

150.    The UH Defendants, as stated by their CEO, knew that Plaintiffs and the other Class members were counting on them to protect their eggs and embryos.

151.    The UH Defendants' CEO admitted that the losses that Plaintiffs and the other Class members experienced was the UH Defendants' fault, because, among other reasons, a remote alarm system that was designed to alert staff in the event there was a problem was turned off.

152. The UH Defendants also explained that the tank that Plaintiffs' and the other Class members' eggs and embryos were stored in was having problems for several weeks.

153. The Center for Medicare and Medicaid Services (CMS) investigated what happened leading up to the March 3-4, 2018 tragedy. The CMS Report containing the results of that investigation indicates that the UH Defendants were aware the storage tank containing Plaintiffs' and the other Class members' embryos and eggs experienced a problem with the liquid nitrogen autofill sensor in January 2018.

154. The UH Defendants were also aware that, despite this problem, a remote alarm was not received by the Fertility Center's staff. The report provides that the UH Defendants did not investigate why a remote alarm was not received following the January problem.

155. By allowing an alarm system to stay off that would have alerted staff that there was a problem in the tank storing Plaintiffs' and the other Class members' eggs and embryos, the UH Defendants acted recklessly, willfully and wantonly, and/or consciously disregarded the rights and safety of Plaintiffs' and the other Class members' eggs and embryos in a manner that the UH Defendants knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members.

156. The UH Defendants also admitted that they knew the tank that was storing Plaintiffs' and the other Class members' eggs and embryos was malfunctioning for months before the March 3-4, 2018 tragedy.

157. By allowing Plaintiffs' and the other Class members' eggs and embryos to stay in a tank that was having problems, without putting in place additional procedures and/or backup plans in place, was reckless, willful and wanton, and/or a conscious disregard of the rights and safety of Plaintiffs' and the other Class members' eggs and embryos in a manner that the UH

Defendants knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members.

158.    Defendant CAS acted recklessly, willfully and wantonly, and/or consciously disregarded the rights and safety of Plaintiffs' and the other Class members' eggs and embryos in a manner that Defendant CAS knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members when its alarm system failed to alert anyone of the temperature fluctuation in the embryology tank located at the Fertility Center.

159.    Defendant CAS knew or should have known that its alarm not alerting anyone of a temperature fluctuation had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members.

160.    Defendant Sodexo acted recklessly, willfully and wantonly, and/or consciously disregarded the rights and safety of Plaintiffs' and the other Class members' eggs and embryos in a manner that Defendant Sodexo knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members when it failed to timely deliver liquid nitrogen to the Fertility Center after receiving an emergency request on March 2, 2018.

161.    Defendant Sodexo knew or should have known that not timely responding to an emergency request for liquid nitrogen from the Fertility Center had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs and the other Class members.

162.    As a direct and proximate result of Defendants' actions and the substantial harm those actions caused, Plaintiffs and the other Class members suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## COUNT XIII
### FED. R. CIV. P. 23(c)(4) "ISSUES CLASS"
#### (against all Defendants)

163.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

164.    There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3).  Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

165.    A resolution (as a class matter) on Defendants' liability will materially advance a disposition of this litigation as a whole.

166.    Plaintiffs, individually, and on behalf of all others similarly situated, also seek an issues class with respect to the UH Defendants' and Defendants Bhatnager's, Goldfarb's, Liu's, and Rossi's liability for the medical malpractice claim alleged below.

## COUNT XIV
### MEDICAL MALPRACTICE
#### (against the UH Defendants and
#### Defendants Bhatnager, Goldfarb, Liu, and Rossi)

167.    Plaintiffs, individually and on behalf of the other Class members, repeat and reallege the allegations in Paragraphs 1-69, above, as if fully alleged herein.

168.    In the alternative to the above-listed claims for relief, and in an abundance of caution, Plaintiffs and the other Class members allege a medical malpractice claim, due to assertions the UH Defendants have made in other pleadings in similar cases, where they claim and have asserted that Plaintiffs' and the other Class members' claims form a medical malpractice case.

169.    Should Plaintiffs' and the other Class members' claims ever be deemed merely a medical malpractice case, Plaintiffs request 90 days to comply with Ohio Civil Rule 10(d), which requires the filing of an affidavit of merit.

170.    At all times relevant to this action, Defendants Goldfarb, Lui, and Rossi were physicians and/or health care providers duly licensed to practice medicine and/or administer medical and IVF care under the laws of the State of Ohio, and they provided medical and IVF care to Plaintiffs and the other Class members.

171.    At all times relevant to this action, the UH Defendants provided medical and IVF care to Plaintiffs and the other Class members through their employed physicians and/or health care providers and/or lab director, and/or lab employees who were duly licensed to practice medicine and/or administer medical and IVF care under the laws of the State of Ohio.

172.    Defendants jointly and severally, individually and by and through their agents and/or employees, had a duty to provide reasonable medical and IVF care and treatment to their patients, including Plaintiffs and the other Class members.

173.    This care included the safe handling and storing of Plaintiffs' and other Class members' eggs and embryos, which the UH Defendants and Defendants Bhatnager, Goldfarb, Lui, and Rossi cryopreserved for future use.

174.    At all times relevant to this action, Plaintiffs and the other Class members relied on Defendants to provide medical and IVF care and treatment in accordance with reasonable standards of care relating to the handling and storing of cryopreserved eggs and embryos.

175.    The UH Defendants and Defendants Bhatnager, Goldfarb, Lui and Rossi, breached the standard of care they owed to Plaintiffs and the other Class members in the medical and IVF care and treatment that Defendants provided.

176.    The UH Defendants and Defendants Bhatnager, Goldfarb, Lui and Rossi, failure to exercise that degree of care, skill, and diligence ordinarily exercised by physicians and health care professional practicing under the same or similar circumstances was a direct and proximate cause of Plaintiffs and the other Class members suffering personal and permanent damage, namely, the destruction of their cryopreserved eggs and embryos.

177.    As a direct and proximate result of the UH Defendants and Defendants Bhatnager, Goldfarb, Lui and Rossi, failing to comport to the standard of care, Plaintiffs and the other Class members suffered permanent and disabling injuries and have suffered damages for pain, suffering, mental anguish, loss of enjoyment and quality of life, and economic harm.

178.    As a direct and proximate result of the UH Defendants and Defendants Bhatnager, Goldfarb, Lui and Rossi, actions, and the substantial harm those actions caused, Plaintiffs and the other Class members suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1.    That the Court certify this action as a class action as requested herein, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' undersigned counsel as Class Counsel;

2.    That the Court certify an issues class, pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure, with respect to the UH Defendants' and Defendants Bhatnager's, Goldfarb's, Liu's, and Rossi's liability for the medical malpractice claim;

3.     That the Court award Plaintiffs and the other Class members compensatory, consequential, and general damages in an amount to be determined at trial;

4.     That the Court award Plaintiffs and the other Class members statutory damages, and punitive or exemplary damages, to the fullest extent permitted by law, in an amount to be determined at trial;

5.     That Plaintiffs and the other Class members be granted the following equitable relief:

      a.  The appointment of an independent, third-party monitor, agreed upon by the parties to this litigation or selected by the Court should the parties be unable to reach agreement, to review, at Defendants' sole expense, Defendants' policies, procedures, and methods for operating the Fertility Center to ensure that this type of tragic event never happens again; and

      b.  Requiring the UH Defendants to share the results of their investigation with the Society for Assisted Reproductive Technology (SART), so that other people can learn from this event, to prevent it from happening ever again.

6.     That the Court award pre- and post-judgment interest on any amounts awarded;

7.     That the Court award the costs and disbursements of the action, along with reasonable attorneys' fees, including fees, costs, and expenses; and

8.     That the Court grant all such other relief as it deems just and proper.

Dated:  March 2, 2020

Respectfully submitted,

*/s/ Mark A. DiCello*
Mark A. DiCello (0063924)
Robert F. DiCello (0072020)
Kenneth P. Abbarno (0059791)
Mark M. Abramowitz (0088145)
**DICELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Tel:  440-953-8888

madicello@dicellolevitt.com
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Adam J. Levitt*
Amy E. Keller*
Adam Prom*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Tel:  312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
aprom@dicellolevitt.com

***Counsel for Plaintiffs and the Proposed
Class***

(* *pro hac vice* motions to be filed)

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

*/s/ Mark A. DiCello*
Mark A. DiCello (0063924)
Robert F. DiCello (0072020)
Kenneth P. Abbarno (0059791)
Mark M. Abramowitz (0088145)
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Tel: 440-953-8888
madicello@dicellolevitt.com
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Adam J. Levitt*
Amy E. Keller*
Adam Prom*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
aprom@dicellolevitt.com

***Counsel for Plaintiffs and the Proposed Class***

(* *pro hac vice* motions to be filed)